SECRIST *v.* CITY OF DETROIT.

1. TRIAL—VOLUNTARY STATEMENTS BY WITNESSES.

The determination as to when a voluntary statement from a witness is of such a nature as to preclude the possibility of a fair trial by improperly influencing a jury must be made in the light of its attending circumstances and the question propounded.

2. APPEAL AND ERROR—VOLUNTARY STATEMENTS—COMPROMISE.

While offers of negotiations and compromise cannot be used as an admission of liability, a voluntary statement by a witness to such effect is not necessarily always reversible error.

3. SAME—MISTRIAL—WITNESSES—NERVOUSNESS—VOLUNTARY STATEMENTS.

Trial court did not abuse its discretion in denying defendant's motion for mistrial because of nervousness of woman as she was being cross-examined by defendant's attorney in personal injury case about her signature on statement which defendant claimed had been made shortly after the accident together with voluntary statement as to negotiations made by another of plaintiff's witnesses, where such incidents occurred during second day of trial and case was submitted to jury seven days later without counsel having thereafter referred to the matter again.

4. STREET RAILWAYS—AUTOMOBILES—CONTRIBUTORY NEGLIGENCE—SUBSEQUENT NEGLIGENCE—EVIDENCE.

In motorist's action against municipality for injuries sustained when streetcar collided with plaintiff's car as it was making a left or U-turn in middle of block, evidence presented questions of fact both as to plaintiff's contributory negligence and defendant's subsequent negligence for consideration of jury and supported its verdict for plaintiff.

5. SAME—AUTOMOBILES—VERDICTS—GREAT WEIGHT OF EVIDENCE.

In motorist's action against municipality for injuries sustained when streetcar collided with plaintiff's car as it was making a left or U-turn in middle of block, verdict for plaintiff *held*, not contrary to the great weight of the evidence.

NORTH, WIEST, and BUTZEL, JJ., dissenting.

Appeal from Wayne; Marschner (Adolph F.), J. Submitted April 11, 1941. (Docket No. 60, Calendar No. 41,555.) Decided October 6, 1941.

Case by Bernard E. Secrist against City of Detroit for injuries arising from the collision of plaintiff's automobile and a streetcar. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Stanley C. Barker* and *Vandeveer & Haggerty* (*Fred L. Vandeveer*, of counsel), for plaintiff.

*Rodney Baxter* and *William J. McBrearty*, for defendant.

Bushnell, J. On January 12, 1937, at about 1:45 p. m., plaintiff Secrist was driving south on Fourteenth street in the city of Detroit. It is not clear whether Secrist was following a southbound streetcar and stopped behind it to make a turn or whether he overtook the streetcar and stopped on the right of the southbound rails to allow it to pass. Defendant claims that plaintiff attempted to make a U-turn approximately 100 feet north of Ash street, either as the southbound streetcar was entering or as it was leaving a safety zone at this corner. In any event, as plaintiff was making the turn a northbound streetcar struck the right side of his automobile, injuring him and the other occupants.

Plaintiff and his wife, son, aunt and niece were on their way to visit at the home of their friends, the Masons, located on the east side of Fourteenth street, a short distance north of Ash street. Mrs. Secrist testified that her husband had on former occasions entered the driveway located at the south side of the Mason home, and at other times he had parked in front of their home. The jury could have determined that plaintiff was intending either to go

into the driveway or to park in front of the Mason home.

Plaintiff claims that the testimony shows that when he was about 100 feet north of the north line of Ash street he stopped his automobile just to the west or right of the southbound streetcar track on Fourteenth street to allow a southbound streetcar to pass. About this time a northbound streetcar was entering the safety zone just south of Ash about 200 feet away. After the southbound streetcar had passed him, plaintiff turned to his left, crossed the southbound track, and drove slowly onto the northbound car track. At this time an automobile proceeding north between the northbound car track and the east curb of Fourteenth, and being driven at a speed greater than that of the northbound streetcar, passed through the intersection ahead of the streetcar. Plaintiff claims that the testimony further shows that he was trapped at this point because he could not back up due to the volume of traffic going south, nor could he go ahead because of the northbound automobile. While in this trapped position plaintiff claims he was struck so hard by the northbound streetcar that his automobile was shoved from 75 to 100 feet north of the point of impact. He maintains that the motorman of the northbound car had a clear view of the situation and could have stopped the streetcar in time to avoid striking his automobile.

Defendant, on the other hand, asserts that Secrist was making a "U-turn" behind the southbound streetcar when the northbound streetcar was within 25 to 50 feet from him. Defendant insists that plaintiff was not trapped on the northbound car track but, on the contrary, that he negligently drove out from behind the southbound streetcar into the path of the oncoming northbound streetcar. De-

fendant argues that its motorman did not have sufficient time to avoid a collision.

After the denial of defendant's motions for mistrial and for a directed verdict, the case was submitted to the jury, which returned a verdict for plaintiff in the sum of $2,000. A motion for judgment notwithstanding the verdict or, in the alternative, for a new trial was made by the defendant and denied.

Appellant argues that the trial court erred in not granting its motion for a mistrial and in not directing a verdict for defendant because of plaintiff's contributory negligence and its freedom from negligence. Appellant also insists that the court erred in refusing to enter a judgment *non obstante veredicto* and that the verdict of the jury is against the great weight of the evidence.

In support of its claim that the court erred in failing to declare a mistrial, defendant relies on the following incidents: One of plaintiff's witnesses, Mrs. Edith Hawk, was cross-examined about a signed statement which defendant claimed she had given to one of its investigators shortly after the accident. She denied that she had written on this statement the words, ''The above is all I know about this accident. Mrs. Edith Hawk.''

Counsel then asked the witness to write the same sentence and sign her name. Thereupon she began to cry and, when questioned about her nervousness, said her husband had ''died about the same time.'' The court excused the jury and discussed the incident with counsel. Defendant's counsel said: ''I don't ask for a mistrial—I am not going to question the witness any further.'' After the jurors returned, the court questioned them as to the effect of the in-

cident and, after receiving their assents that they could proceed fairly with the trial, the court cautioned them to dismiss the matter from their minds.

Although defendant declined to request a mistrial because of this incident, he claims that, when this occurrence is considered with the following incident, a mistrial should have been ordered. On the same day plaintiff's wife was cross-examined and, when asked by defendant's counsel whether a statement she made to one of its investigators was correct, she replied: "But they told my husband that they was going to settle, and that they only needed one more thing, and they was going to settle it." Defendant argues that this inadmissable testimony of an offer of compromise in conjunction with the former incident so prejudiced the minds of the jurors that a fair trial was made impossible. In its brief defendant states that Mrs. Secrist's answer was "not even approximately responsive to the question asked the witness." However, the trial court deemed it somewhat responsive.

No hard and fast rule can be laid down as to when a voluntary statement from a witness is of such a nature as to preclude the possibility of a fair trial by improperly influencing a jury. Each statement must be considered in the light of its attending circumstances and the question propounded. While offers of negotiations and compromise cannot be used as an admission of liability, a voluntary statement to this effect is not always reversible error.

In the instant trial, both incidents occurred on the second day and the case was not submitted to the jury until seven days later, and neither counsel referred to the matter again. The trial court did not abuse its discretion in denying defendant's motion

for a mistrial. *Jolman* v. *Alberts*, 192 Mich. 365; *Burnett* v. *King*, 252 Mich. 189; *Greene* v. *Richer*, 278 Mich. 1; and *Lucy* v. *Dowd*, 285 Mich. 530.

Our study of the testimony requires the conclusion that there were disputed questions of fact both as to the claim of plaintiff's contributory negligence and defendant's subsequent negligence. The trial court, therefore, properly submitted these questions to the jury and there is testimony to support its verdict. This verdict is not contrary to the great weight of the evidence. *King* v. *Railway Co.*, 176 Mich. 645; *Huff* v. *Michigan United Traction Co.*, 186 Mich. 88; *Whitman* v. *Collin*, 196 Mich. 540; and *Golob* v. *Detroit United Railway*, 228 Mich. 201.

The judgment entered upon the verdict is affirmed, with costs to appellee.

SHARPE, C. J., and BOYLES and CHANDLER, JJ., concurred with BUSHNELL, J.

BUTZEL, J. (*dissenting*). In addition to the facts set forth in Justice BUSHNELL's opinion, the testimony of the motorman of the northbound streetcar shows that when he first saw plaintiff bring his automobile across the northbound tracks he believed that plaintiff would cross over them to the east side of the street. There was nothing to indicate to him that plaintiff would stand still on the tracks of the oncoming streetcar. When prolonged motionlessness on the tracks at length brought home to the motorman plaintiff's intention not to move off the tracks, he made every conceivable effort to stop the streetcar but was then too late. The undisputed testimony shows that the motorman threw on the emergency brakes, pulled his reverse lever and opened the sand box so as to drop sand on the tracks,

that these steps diminished the force of, but did not forestall, the collision. The streetcar was not being run recklessly or at an unlawful rate of speed. We find no negligence on the part of defendant. Even if it were chargeable with any negligence, plaintiff would be guilty of contributory negligence in driving into the pathway of the oncoming streetcar. Nor can defendant be charged with subsequent negligence, because its motorman had no chance to avoid the accident. The streetcar aims to go on a scheduled time. It carries a large number of passengers. It cannot be veered off to the side as it can only proceed in a straight direction on the tracks. The motorman may assume that a person proceeding across the tracks will not stop on the tracks. By the time his reaction shows this is not to be the case, it takes the driver some time to bring the heavy streetcar, weighing many tons, to a stop. Under most favorable conditions, the testimony shows that this can be done within 40 feet when a streetcar is going 20 miles an hour, but this does not take into consideration the human element in the case where a motorman has reason to believe that an automobile is not going to stop. The judge should have granted the motion for judgment *non obstante veredicto.*

It becomes unnecessary to discuss whether the verdict was against the great weight of the evidence. We shall assume for the purpose of this decision that the motorman did not clang his bell, though he and others testified that he did. However, the failure to clang the bell was neither a proximate nor a contributing cause of the accident, which happened in clear daylight when both the streetcar and automobile were seen. Plaintiff does not claim that he sounded his horn so as to make his peril known to the motorman.

We shall disregard statements taken after the accident from plaintiff's wife which contradicted her testimony on the trial, and give credence, as the jury must have, to the fact that the day on which defendant's investigator called on her at the hospital, she was not in a fit mental condition to answer questions correctly. She remained in the hospital only a day after the accident, but at the time she was interviewed, she had had a dose of aspirin and · codeine.

We shall not dwell on the peripheral vision of the plaintiff for his view to the immediate south and east may have been cut off when he brought his automobile to a standstill to the west of and alongside or near the rear end of the southbound streetcar. We shall view plaintiff's witnesses' testimony in the light most favorable to plaintiff.

It becomes necessary to set forth as succinctly as possible those portions of the testimony given by plaintiff's witnesses which bear upon the vision and speed of the vehicles involved before and up to the collision. Of the witnesses sworn for plaintiff, only five were in the vicinity when the collision occurred. They are Bernard Secrist, plaintiff, driver of the damaged automobile; Edith Hawk, friend of plaintiff's family, who was just entering the front hallway of the Mason home when the crash occurred; Claude Virginia Mason, who was standing at a window of the Mason home; Edna Secrist, wife of plaintiff, who sat at his right in the front seat of the damaged car; and Thomas Savage, who lived on the northeast corner of 14th and Ash and was standing on his front porch watching the northbound streetcar. Plaintiff himself admitted on the day of the collision that he did not remember the number of the Mason house, and although he knew the house, he was looking for the street number on the east

side of 14th avenue when he stopped the first time
to the west of the southbound car tracks. However,
his mind was a blank as to what occurred when he
stopped his car on the streetcar tracks as far as the
means and cause of the accident are concerned. He
stated that he could not say whether he looked to
the north or whether he looked to the south when
he made the turn to cross the road, nor whether
he turned out from behind the streetcar into the
path of the northbound car. A doctor testified that
the loss of memory was a common effect and
cardinal symptom of cerebral concussion and that
plaintiff could have suffered loss of memory because
of such collision. However, the doctor did not ex-
plain that plaintiff's memory could once have been
lost, and then, a few days after the accident, have
returned to him when he gave a statement in an
investigation conducted in the prosecutor's office,
and finally, at the time of this trial, again fail him
so that he could not remember whether he made a
U-turn or other fact which would not have been
at all beneficial to his case. We are not impressed
with this second loss of memory. We again cannot
give, for the purposes of the case, plaintiff credit
for not remembering the details that he gave in the
prosecutor's office.

Edith Hawk was not an eyewitness of the crash
as her back was turned towards the street while
she was entering the Mason home when the accident
occurred.

Claude Virginia Mason testified that she watched
the northbound streetcar continuously from the
moment when she first saw it south of the inter-
section of Ash street until it hit plaintiff's car. She,
however, did not testify that she saw the fast-
moving car pass the northbound streetcar at any
time. This is rather extraordinary since it is con-

ceded that the northbound car did overtake and pass the northbound streetcar before the collision and from her position of advantage on the east side of the street it is difficult to reconcile her failure to observe it with her claim of having observed continuously the northbound streetcar. She finally was asked whether she saw the car, and she replied that she did not see this car that the streetcar hit but saw it right away afterwards, and the first time she saw it was after the crash occurred. She stated that the streetcar was going about 20 miles per hour, a "terrific speed for to be right there in that district," and she did not see that car change its speed at any time and that from where she was standing she could not see the collision.

The testimony of Edna Secrist, not a disinterested witness and the wife of plaintiff, seems to be the foundation for his entire case.

To visualize the conditions that prevailed, it is necessary to get the exact situation in mind. At the southeast corner of Ash Street, there is a safety zone, but there was no occasion for the northbound streetcar to stop at this zone. The distance between the center of the intersection of Ash (where the gray, northbound automobile overtook and passed the northbound streetcar) and the point of collision was not less than 125 feet. Mrs. Secrist testified that when she first saw the northerly-bound streetcar, when her husband stopped his automobile, it was south of Ash Street about in the safety zone, that she thought it was stopped or going very slow, and that it accelerated its speed so as to collide with plaintiff's car. She claims that they stopped their car because the northerly-bound automobile going at a tremendous speed passed the streetcar; that at the time that the automobile passed the

streetcar the latter was just crossing Ash Street.
Then she was asked:

"*Q.* And whereabouts at that time was the auto-
mobile in relation to the streetcar?

"*A.* Well, the automobile was—the first house;
in front of the first house.

"*Q.* That is, this house here (indicating on the
diagram on the blackboard)?

"*A.* Yes.

"*Q.* So that at that time the automobile had
moved out in front of the streetcar?

"*A.* Yes.

"*Q.* And at the time that the northbound street-
car was opposite the intersection of Ash and the
automobile was opposite the first house, where was
your car at that time?

"*A.* We were still on the car track. We had
stopped.

"*Q.* And did you observe the automobile after
that time?

"*A.* It went on."

Later when Mrs. Secrist was recalled on cross-
examination, she testified that she did not know
whether her husband was going to turn around on
14th avenue in order to make a turn or whether
he was going to drive into the driveway or just what
he was going to do.

"*Q.* All right (indicating on the diagram). And,
then, the second time you saw the streetcar, it hadn't
crossed Ash. It was approaching, I presume, the
south curb of Ash, was it, where my finger is on the
blackboard?

"*A.* When I saw it the second time?

"*Q.* That is right.

"*A.* That was just before we stopped. It was—
yes, that is right.

"That is the northbound track. As we were moving across the northbound tracks, I saw the streetcar a second time. It hadn't crossed yet, it was south of Ash. I would say the front of it was about even with the south curb of Ash, somewhere close by there.

"That would be a distance the width of Ash, then, and whatever distance we were north of Ash away from us.

"*Q.* That would be approximately 175 feet, wouldn't it, if the front of the streetcar was even with the south curb of Ash. It would be about 140 feet, according to the measurement, is that right? Approximately?

"*A.* Well, if that's on the—just about the corner there—it would be right.   *   *   * .

"*Q.* Well, with no automobile and no streetcar within 140 feet of you, Mrs. Secrist, can you tell us why your husband didn't either complete his turn or go into the driveway alongside the house that you were going to visit?

"*A.* Well, as we was moving—we hadn't stopped when you asked me the question. We was still—we was still moving across the track and the automobile and the streetcar was still coming and the northbound streetcar was still coming toward us, and during that time an automobile passed the streetcar.

"*Q.* Where did the automobile pass the streetcar?

"*A.* I would think it passed about halfway across Ash."

Further referring to the northbound streetcar, she testified as follows:

"*Q.* When that passed you, that was the only thing that prevented you from going ahead, wasn't it?

"*A.* It hadn't passed us yet.

"*Q.* I know that. I say, when it passed you, nothing else prevented you from going ahead, no other northbound automobile traffic?

"*A.* There was—nothing passed after that.

"Yes, it did pass in front of us. That would be to the east of us.

"*Q.* Where was the streetcar when this automobile passed in front of you?

"*A.* The automobile just got by and the streetcar come right after it.

"*Q.* Where was the streetcar when the automobile passed you?

"*A.* I don't know. It was almost on top of us. No, it was not at the first house. I am positive of that.

"*Q.* Where was it if it wasn't at the first house?

"*A.* It was almost on top of us.

"*Q.* Where was this automobile when you first saw it?

"*A.* When I first saw the automobile it was crossing the streetcar—about the—(there was a pause)—I would say about the middle of Ash, on, just about the north corner. * * *

"*Q.* How fast was the automobile going, Mrs. Secrist?

"*A.* The automobile was going very fast.

"*Q.* And how fast is 'very fast?'

"*A.* I don't know.

"I do not know how fast the streetcar was going in miles an hour.

"*Q.* Do you know whether the automobile was going half as fast as the streetcar, or, twice as fast as the streetcar? Can you give us any idea, as a matter of comparison between the two speeds?

"*A.* Well, I couldn't give that accurately, because as the streetcar came towards us, it increased its speed and I couldn't— * * *

"*Q.* Do you mean, to say, Mrs. Secrist, that from the time that you got on the track, that the motor-

man on the streetcar increased the speed of the streetcar all the time?

"*A*. That's right.

"*Q*. How far away was the streetcar when this automobile passed you?

"*A*. It was almost against us.

"*Q*. How far would that be?

"*A*. It was right at the side. I don't know. I just know that we didn't have time to get off the track."

A disinterested witness of plaintiff, Thomas Savage, testified that he saw the accident, and that the streetcar was going at approximately 20 miles an hour and that he was accustomed to watching streetcars; that the crash occurred about 140 feet north of the northerly line of Ash Street; that he saw the large automobile first at the rear of the streetcar and at the intersection of Ash street, and that he watched it pass; that the automobile was going from 40 to 45 miles an hour in a northerly direction, but when asked whether at the time of the crash the automobile passed in front of the streetcar his reply was:

"It might have been a second or two seconds before, but it happened so quickly it seemed all together, because I thought it was the turning in of the streetcar, that the streetcar had gotten this car, this gray car."

On cross-examination he testified that this automobile was going 35, 40 or 45 miles an hour and just after it passed the collision occurred within a few seconds but he would not state the exact number of seconds, but that it passed so quickly that he could not tell the exact number of seconds.

Again disregarding the testimony of the motorman and conductor of the streetcar as well as that of two disinterested witnesses who were in the car

and saw the entire accident and who testified that the motorman was blameless, and looking only at the distances and speeds testified to by plaintiff's witnesses, we find that from a mathematical point of view, the figures do not bear out plaintiff's claims. For, if the statements are true, they show that plaintiff had ample time in which to move off the streetcar tracks, and corroborate the testimony of the motorman that he believed that plaintiff was moving off the tracks and would not bring his car to a standstill in the pathway of the oncoming streetcar. In the following calculations we assume that the streetcar moved from the center of the intersection to the point of collision at a constant rate of speed. We assume also that this rate of speed was 20 miles per hour, since there is no testimony from which the jury could find that the streetcar at any time moved more rapidly than 20 miles per hour. It is true that Mrs. Secrist stated that the streetcar increased its speed after crossing the intersection, but this only shows that our assumptions are more favorable to plaintiff than the evidence justifies, because she also testified that while it was in the intersection the streetcar was moving very slowly, and a continuous increase from near standstill to a speed which never exceeded 20 miles per hour would take the streetcar longer to reach plaintiff than a constant speed of 20 miles per hour would take. The speed of the northbound automobile was estimated at from 35 to 45 miles per hour. No testimony puts it less than 35. The length of time any vehicle takes to cover 125 feet varies with its speed. Mathematically at 45 miles per hour, it takes 1.89 seconds; at 35 miles per hour 2.44 seconds; at 20 miles per hour 4.26 seconds. If the northbound automobile was traveling at the speed of 45 miles per hour, it would have given

plaintiff an interval before the streetcar could come up of 2.37 seconds to cross the tracks. If it was only going at 35 miles, it would have given him 1.82 seconds to cross the tracks and been completely out of danger. To move a distance of 13 feet, the distance it took to cross the tracks, plaintiff could have driven in 1.82 seconds at less than 5 miles per hour. He did not claim that his automobile was stalled at all or that his motor had stopped running. All he would have had to do was make a slight effort to move to a place of safety. I do not believe, however, that it is necessary to indulge in mathematical conclusions, for the record shows that the entire accident happened in seconds or split seconds. This is borne out by plaintiff's own witness Savage, whose testimony we have heretofore referred to. Plaintiff carelessly and heedlessly drove into the path of the oncoming car and by the time that the motorman could realize plaintiff's peril and do everything then that could possibly be done, the accident occurred. A person making a lefthand turn in the path of an oncoming streetcar runs the danger of collision. It is true that it becomes the duty of the motorman if he has ample time to see the car stalled on the track or even negligently stopped by a careless or selfish automobilist, to do his utmost to avoid an accident, but when the entire contributing cause of a collision took place in a few seconds or less, and everything is done by the motorman to avoid an accident when he realizes the peril of the automobilist caused by his own negligence, there cannot be any recovery.

In *Krouse* v. *Railway Co.,* 215 Mich. 139, the automobile in which plaintiff's decedent was riding stalled on defendant's railroad tracks when defendant's car was 800 feet away, going not more than 20 miles per hour. Suit was brought on the theory

of subsequent negligence, and the trial judge directed verdict for defendant, stating:

"In my judgment, the time which would be consumed by the running of the [railway] car over this 800 feet would be sufficient time for Mr. and Mrs. Krouse [plaintiff and the decedent, respectively] to have got off the crossing, either get out of the automobile or to have rolled their machine off the crossing. Under those circumstances, and it appearing that they did not do that, and had they done it the accident would have been avoided, in my judgment, as a matter of law, the plaintiff is guilty of such contributory negligence as to prevent a recovery."

We affirmed the direction of verdict, and, in an opinion by Mr. Justice WIEST, made the following observations, which are equally applicable to the case at bar:

"Does the evidence show that the sole proximate cause of the death of plaintiff's decedent was the negligence of defendant's servant in charge of the car, or must it be said from the undisputed evidence that the negligence of plaintiff's decedent continued up to the very time of the accident and, therefore, was a proximate cause of the injury? This is not a case where the party injured negligently placed herself in a position of danger without reasonable opportunity to get out again in time to avoid injury and, therefore, was injured by reason of failure of the motorman to note her peril and act so as to save her from injury if possible. Plaintiff's decedent knew of her peril before it could possibly have been apparent to the motorman.    *    *    *

"If plaintiff's decedent could have escaped injury by the exercise of ordinary care and she failed to do so then her own negligence was the proximate cause of the accident and there can be no recovery.

If plaintiff's decedent's want of ordinary care was in whole or in part a proximate cause of her injury there can be no recovery. *Williams* v. *Edmunds,* 75 Mich. 92.  *  *  *  [There was] no excuse for remaining in a place of danger so apparent that the very basis of plaintiff's claim of right to recover rests upon such peril being cognizant to the motorman of the oncoming car in time to stop. Supplementing the negligence of going on the track the deceased introduced through her own inaction the negligent act of remaining in a place of danger when she could just as well have stepped to a place of safety. Such new negligence, in law, is regarded as the proximate cause of the accident.

"There is a vast difference between negligently getting in a place of danger without ability to remove therefrom and remaining in such a place after the danger is apparent and there is opportunity open to avoid injury and a way to escape pointed out. To hold defendant's negligence as the proximate cause of the accident and relieve plaintiff's decedent from her negligence in getting in a place of danger and thereafter remaining therein conscious of her peril and with the way open for her to escape, it would be necessary to find that the negligence of defendant intervened between such negligence of plaintiff and the accident and was the sole proximate cause of the accident. This cannot be done upon this record.  *  *  *

"The principle which controls where the danger is discovered applies to plaintiff's decedent as well as to the defendant. Under the evidence, and the most favorable view thereof, the proximate and efficient cause of the accident involved the concurrent negligence of plaintiff's decedent and defendant, unbroken by any efficient supervening cause. The accident would not have happened if plaintiff's decedent had exercised the most ordinary prudence and removed to a place of safety after her danger was clearly apparent to her. It was her negligence in continuing in the place of danger after she was

fully aware of her peril that was as much the efficient cause of the accident as defendant's negligence. Such negligence on her part contributed to the accident as a proximate cause and precludes recovery even though defendant's negligence operated up to the time of the accident. When the auto stalled upon the track it was the duty of defendant's servant, when he saw or should have seen the peril to its occupants, to exercise reasonable care to avoid running the auto down and it was equally the duty of plaintiff's decedent, when she had opportunity to do so, to remove herself to a place of safety. * * *

"The rule of gross negligence contended for by plaintiff has no application to the facts in this case, but only applies to a case where a plaintiff is in some place of danger from a threatened contact with some agency under the control of the defendant, and where the plaintiff cannot, and the defendant can, prevent the injury. *O'Brien* v. *McGlinchy,* 68 Me. 552.

"Upon this record it must be held that both plaintiff's decedent and defendant were contemporaneously and actively in fault and the accident was the result of their mutual carelessness and the plaintiff cannot recover."

In the case at bar no claim is made that plaintiff's motor stalled. The time involved in the instant case was too short to permit the occupants of plaintiff's car to disembark and betake themselves to positions of safety, but this was not necessary, since the motor was still running, and the time allotted was ample, as we have already shown, to drive the automobile off the tracks either before or after the northbound automobile passed by.

In *Rosenfeld* v. *City of Detroit,* 274 Mich. 650, in a case involving quite similar facts, directed verdict was affirmed by this court. There plaintiff was stopped (his motor was still running) on street railway tracks, unable to move off them because of

a flow of automobile traffic ahead of him in the lane which he desired to enter. There was nothing in that case to indicate that there were any gaps in this stream of traffic affording plaintiff an opportunity to escape, so the decision against plaintiff on the law was stronger in that case than our decision against plaintiff herein could be.

Nevertheless, the *Rosenfeld Case* is important as bearing on the questions of ordinary and subsequent negligence on the part of the motorman. There plaintiff was standing, his automobile facing south, across the eastbound car tracks, unable to enter the east lane of the street because of continuous eastbound automobile traffic. Defendant's motorman should have seen plaintiff at a distance of 300 feet. The streetcar was then traveling at the rate of 30 miles per hour, and continued that speed without abatement until the crash. The motorman's failure to stop or slow down the streetcar before striking plaintiff's automobile was charged as subsequent negligence by plaintiff, but we held, in an opinion written by NORTH, C. J.:

"Decision herein turns upon whether the physical facts are such that they conclusively render plaintiff's theory untenable. We may assume, as plaintiff asserts, that the motorman saw or should have seen plaintiff's automobile come to a stop on defendant's eastbound track when there was an intervening distance of approximately 300 feet. At a speed of 30 miles per hour the streetcar reached the point of collision in six or seven seconds. Obviously the motorman was not in a position to ascertain instantly whether plaintiff could continue his course across defendant's track to a point of safety before the streetcar arrived at the crossing. The motorman had a right to assume that plaintiff would not drive upon the track in the face of a rapidly approaching streetcar unless plaintiff first reasonably

assured himself that the way was open to cross the track completely to a place of safety. It is not the law that a motorman must bring his car under complete control whenever he observes in the distance a motor vehicle crossing the car track. Subsequent negligence will not be imputed to a litigant merely because of his failure to anticipate unlawful action on the part of the one charging him with such negligence. *Sanderson* v. *Barkman,* 264 Mich. 152.

"While his reasons are not set forth in the record, the trial judge must have been of the opinion that the proximate cause of this collision was plaintiff's own negligence, and that the interim of time after the motorman observed or should have observed plaintiff's danger was so short that it was not possible for the motorman to avoid the collision. The record is such that it abundantly sustains this view. The crash must have occurred almost instantly after the motorman became aware or should have become aware of plaintiff's perilous condition.
\* \* \*

"Under the facts of this case there is no room to apply the doctrine of discovered or subsequent negligence. *Boerema* v. *Cook,* 256 Mich. 266; *Harrison* v. *Eastern Michigan Motor Bus Co.,* 257 Mich. 329. At best plaintiff made a case which disclosed concurrent negligence on the part of himself and of defendant's motorman. The circuit judge was right in directing a verdict in favor of defendant."

The evidence put in by plaintiff simply does not hang together in such a fashion as to support his claim. There are items even in plaintiff's own case, such as the admission by witness Savage that the entire collision, passing of the streetcar by the northbound automobile, and all, occurred almost instantaneously, which support defendant's version of what took place. Such inharmonious elements in plaintiff's case have been ignored for the purpose of deciding whether the motion for directed verdict should have been granted, of course. But we think

that they, together with defendant's evidence, point to what actually occurred. Defendant's version is that plaintiff's automobile did not emerge from behind the southbound streetcar until the northbound streetcar had already begun to pass the southbound at a point north of the intersection of Ash, that at that time it was too late to avoid hitting plaintiff, that in a split second *after* that, the northbound automobile passed the northbound streetcar, and that immediately thereafter defendant's streetcar hit plaintiff's automobile, while defendant's motorman was making every effort to stop the car. This version, which points to an instantaneous catastrophe, lays negligence at the door of plaintiff and perhaps at that of the northbound automobile, but leaves defendant's motorman free of any blame. We mention defendant's version only because we think it makes understandable what actually occurred. It is of no legal importance in deciding this appeal. Plaintiff's story must be taken as it stands.

Where reasonable men could draw different conclusions from a given state of facts (plaintiff's evidence), the case must be submitted to the jury. But where, as here, the inescapable inferences which must be drawn from plaintiff's story as it was told charge him with contributory and concurrent negligence, and reasonable minds could not differ as to this conclusion, then it is the duty of the trial court to grant motion for directed verdict, or give judgment *non obstante veredicto.*

For the error of the circuit judge in failing to do this, the judgment should be reversed, and judgment notwithstanding the verdict should be ordered entered accordingly. The city should have costs.

NORTH, J. (*dissenting*). Careful review of this record brings the conviction that the judgment

entered in the circuit court should be reversed without a new trial for the following reasons. Before plaintiff in making a U-turn placed his automobile in the path of northbound traffic, either automobile or streetcar, it was incumbent upon him to use reasonable care to ascertain whether he could make the turn safely. Regardless of whether at the inception of making the U-turn plaintiff could have seen the approaching streetcar and automobile traffic from the south or whether his vision was blocked and he was not able to make such an observation, it was an act of negligence on his part to drive his automobile into the line of northbound traffic. That there was in dangerously close proximity rapidly approaching northbound traffic, both streetcar and automobile, is undisputed in this record. Plaintiff's contributory negligence was a proximate cause of the collision.

Since under the facts as disclosed by the testimony offered in behalf of plaintiff it appears that at most only four or five seconds intervened between the time when plaintiff claims his position of danger should have been discovered by defendant's motorman, the theory of subsequent negligence is not applicable. It conclusively appears in this record that during this brief interval defendant's motorman did everything physically possible to avoid the collision but without avail. Under such circumstances plaintiff was not entitled to go to the jury on the theory of discovered or subsequent negligence. *Rosenfeld* v. *City of Detroit,* 274 Mich. 650.

The judgment for plaintiff entered in the circuit court should be reversed without a new trial. Defendant should have costs of both courts.

WIEST, J., concurred with NORTH, J. McALLISTER, J., took no part in the decision of this case.